# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BRICKLAYERS PENSION FUND OF WESTERN PENNSYLVANIA, derivatively on behalf of CENTENE CORPORATION, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2022-1118-MTZ |
| CYNTHIA J. BRINKLEY, JEFFREY A. SCHWANEKE, JESSE N. HUNTER, KENNETH A. BURDICK, BRANDY BURKHALTER, H. JAMES DALLAS, FREDERICK H. EPPINGER, RICHARD A. GEPHARDT, ORLANDO AYALA, JESSICA L. BLUME, LORI J. ROBINSON, and WILLIAM TRUBECK, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| CENTENE CORPORATION, | ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted:  November 17, 2023
Date Decided:  July 12, 2024

Mark Richardson, LABATON SUCHAROW LLP, Wilmington, Delaware; Nathaniel L. Orenstein, Steven L. Groopman, BERMAN TABACCO, Boston,

Massachusetts, *Attorneys for Plaintiff Bricklayers Pension Fund of Western Pennsylvania.*

Raymond J. DiCamillo, Kevin M. Gallagher, Spencer V. Crawford, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Glenn Kurtz, Andrew Hammond, WHITE & CASE LLP, New York, New York, *Attorneys for Defendants Cynthia J. Brinkley, Jeffrey A. Schwaneke, Jesse N. Hunter, Kenneth A. Burdick, Brandy Burkhalter, Frederick H. Eppinger, Richard A. Gephardt, Orlando Ayala, Jessica L. Blume, Lori J. Robinson, and William Trubeck.*

Paul J. Lockwood, Lauren N. Rosenello, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware, *Attorneys for Nominal Defendant Centene Corporation*.

**ZURN, Vice Chancellor.**

Nominal defendant Centene Corporation is a healthcare company that administers Medicaid plans. At all relevant times, state agencies paid Centene to administer Medicaid plans in between twenty and thirty states. Most of Centene's revenue is paid under a reimbursement model keyed to Centene's costs. As alleged, in early 2018, a public backlash started brewing against a Medicaid pricing practice known as spread pricing. Centene, like other companies, used spread pricing in many states. Though controversial for, among other things, its lack of transparency, the practice was generally legal. But the backlash brought regulatory scrutiny and attracted the attention of Ohio's attorney general. In response, Centene began to move away from spread pricing to a more transparent model and engaged in a public relations and lobbying campaign. Centene's board of directors (the "Board") was kept at least minimally apprised of the regulatory and public relations risks spread pricing presented, as well as the company's response.

But Centene had problems with its administration of Medicaid pharmaceutical benefits that the Board was not aware of. In 2016, four Centene officers devised a scheme to increase their incentive-based compensation by causing Centene's subsidiaries to inaccurately report their costs and seek reimbursement to which they were not entitled. The scheme violated applicable law and constituted a breach of Centene's contracts with state Medicaid agencies.

1

As the years went on, regulators and law enforcement in Ohio, then in other states, began to focus on Centene's pharmacy benefit management operations. The Board was informed of regulatory investigations in four states, and what was originally portrayed as a public relations risk was eventually presented more clearly as a legal risk. The Board received quarterly updates on the relevant risks, and each time was assured management was working to address them. Separately, starting in 2019, the Board was told of shortcomings Centene had detected in one of its compliance monitoring processes; as part of the same update, the Board was told of specific steps being taken to address those issues.

In April 2021, the Board was told the Ohio attorney general filed a complaint against Centene and its subsidiaries alleging the officers' scheme violated various laws and breached its contract with the Ohio Department of Medicaid. From there, the Board promptly acted, with Centene retaining a law firm to conduct an investigation and the Board retaining another firm to review that investigation. The investigation resulted in the termination of one employee alleged to be involved in the scheme.

The scheme began to cost Centene. First, it settled with the Ohio attorney general for over $88 million. Then it settled litigation threatened by the Mississippi attorney general for $55.5 million. Over the next year and a half, Centene entered into eleven other settlements, agreeing to pay a total of $596 million. As of the filing

of this action, it was negotiating nine more settlements.  The company announced that it recorded a settlement reserve of $1.2 billion.

After receiving books and records, plaintiff Bricklayers Pension Fund of Western Pennsylvania ("Plaintiff") filed this derivative action seeking to hold Centene's directors and officers liable for that loss.  In typical fashion, the defendants moved to dismiss on the grounds that the decision to sue Centene's fiduciaries on the scheme, and for the directors' alleged failure to exercise adequate oversight, belongs to Centene's Board.  This decision considers whether a majority of Centene's current directors themselves face a substantial likelihood of liability such that they cannot impartially consider bringing claims.

Plaintiff has fallen short of demonstrating a majority of Centene's current directors face a substantial likelihood of liability, either in the maintenance of the Board's reporting systems, or in failing to respond to the alleged notice of the underlying wrongdoing.  Plaintiff's claims against Centene's fiduciaries for the underlying scheme are left for the Board; Plaintiff's complaint is dismissed.

## I.    BACKGROUND[1]

The facts are drawn from the operative complaint, the documents integral to it, and those incorporated by reference.[2]  Plaintiff demanded and received books and records before filing its complaint in this action.[3]  The following is the partial picture available to the Court at this stage, with all reasonable inferences drawn in Plaintiff's favor.

### A.    Centene's Business

Nominal defendant Centene is a multinational healthcare company.  In 2021, Centene generated nearly $126 billion in revenue.[4]  That revenue resulted in earnings from operations of almost $1.8 billion.[5]  Plaintiff alleges Centene's "primary business is providing health insurance and prescription drug benefit services to state

---

[1] Citations in the form "Compl." refer to Plaintiff's complaint in this action, available at docket item ("D.I.") 1.  Citations in the form "Crawford Aff." refer to the affidavit of Spencer V. Crawford, available at D.I. 21.  Citations in the form "Szustak Aff." refer to the affidavit of Casimir O. Szustak, available at D.I. 29.  Citations in the form "Crawford Reply Aff." refer to the affidavit of Spencer V. Crawford, available at D.I. 42.

[2] *BitGo Hldgs., Inc. v. Galaxy Digital Hldgs., Ltd.*, -- A.3d --, 2024 WL 2313115, at *1 n.1 (Del. May 22, 2024).

[3] That production was made pursuant to an agreement providing that the documents would be incorporated by reference into any related complaint Plaintiff filed.  Crawford Aff., Ex. 1 ¶ 2(g).  Those books and records are incorporated by reference.  *See Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 796–99 (Del. Ch. 2016), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019).

[4] Crawford Aff., Ex. 2 at 51.

[5] *Id.*

Medicaid programs."[6]  Medicaid is a public "health insurance program for low-income Americans."[7]  It provides both medical and pharmaceutical benefits. Medicaid "is jointly funded by the federal and state governments and administered by state agencies."[8]  State agencies delegate the task of administering Medicaid to private entities like Centene and its subsidiaries.

Those private entities are most commonly compensated through managed care plans.  The entities that administer Medicaid managed care plans are known as managed care organizations ("MCOs").  State agencies pay MCOs a monthly fixed dollar amount for each person enrolled in the state Medicaid plan.[9]  Those payments, known as capitation payments, are derived from historical cost data MCOs provide to state Medicaid agencies.  That is, the capitation payments are calculated in part based on the MCO's actual "expenditures on behalf of plan members."[10]

MCOs assist in the administration of pharmaceutical benefits, and usually subcontract this function out to pharmacy benefit managers ("PBMs"). PBMs often have more leverage than MCOs to negotiate favorable reimbursement rates, rebates,

---

[6] Compl. ¶ 22.

[7] *Id.* ¶ 46.

[8] *Id.* ¶ 47.

[9] MACPAC, *Provider Payment and Delivery Systems*, https://www.macpac.gov /medicaid-101/provider-payment-and-delivery-systems (last visited July 8, 2024).

[10] Compl. ¶ 51.

and discounts. PBMs are generally compensated through one of two models. The first is known as pass-through pricing.[11] Under a pass-through pricing model, the MCO pays the PBM the same amount the PBM reimburses the pharmacy plus a fixed administrative fee. The second is known as spread pricing. Under a spread pricing model, the PBM profits from the difference between the pharmacy's invoice to the PBM and the MCO's reimbursement payment. "For example, if a PBM charges a MCO $10 for a drug but reimburses the pharmacy $7 for the same drug, the PBM pockets $3."[12] Spread pricing generally features a lack of transparency, making it more controversial than pass-through pricing. Despite the controversy, spread pricing is generally legal, though some states that previously allowed it began prohibiting it during the relevant time.

As of 2015, at a high level, Centene's Medicaid business was structured as follows: Centene operated Medicaid plans in multiple states through individual MCO subsidiaries, with a different subsidiary for each state. Each subsidiary contracted with a state Medicaid agency to provide medical and pharmaceutical benefits to Medicaid enrollees.[13] The MCO then subcontracted certain pharmacy benefit administration responsibilities to Envolve Pharmacy Solutions ("Envolve"),

---

[11] Pass-through pricing is also known as transparent pricing.

[12] *Id.* ¶ 57.

[13] The parties have not addressed whether Centene administers Medicaid plans under different models.

6

its in-house PBM.[14]  In many states, Envolve was compensated through a spread pricing model.  In others, it used a transparent pricing model.

### B.    The Cost Reporting Scheme

By 2015, Centene "was facing competitive risks due to consolidation among major health insurers."[15]  In July it announced a $6.8 billion merger with Health Net, Inc., whose in-house PBM subcontracted its PBM functions to a third-party PBM (the "CVS Caremark Contract"), CVS Caremark ("Caremark PBM").  Caremark PBM was one of the nation's largest PBMs, enabling it "to negotiate much more favorable pharmacy reimbursement rates and other prescription drug-related discounts than what [Centene] could achieve through [Envolve]."[16]  Centene anticipated significant cost savings from the CVS Caremark Contract.

Shortly after the Health Net acquisition, four Centene officers implemented a scheme to extract additional value out of the CVS Caremark Contract (the "Cost Reporting Scheme").  If successful, the officers would profit from increased merger-related incentive payments because the benefits could be categorized as merger synergies.  To implement the scheme, then-CEO Michael Neidorff worked

---

[14] A footnote in the defendants' opening brief suggests some of Centene's health plans did not use Envolve.  D.I. 20 at 10 n.11.  The footnote cites no support, and the Court is aware of none in the record.  I assume that Envolve was the PBM for all Centene's health plans.

[15] Compl. ¶ 80.

[16] *Id.* ¶ 83.

with defendants Cynthia Brinkley, then executive vice president of global corporate development; Jesse Hunter, then executive vice president of products; and Jeffrey Schwaneke, then executive vice president, CFO, and treasurer.

The Cost Reporting Scheme had three prongs. In the first, Envolve enjoyed prescription drug discounts under the CVS Caremark Contract but did not report those discounts to state Medicaid agencies. Because state Medicaid agencies set capitation payments based on MCOs' actual costs, omitting those discounts allowed Centene's MCOs to reduce costs without affecting capitation payments. This prong was in place from January 2017 through December 2020. Through the second, Envolve used Caremark PBM's pharmacy dispensing fee discounts, but reported its own higher, undiscounted costs. This prong was in place from October 2016 through July 2018. And in the third, Envolve falsely reported prescription drug expenditures paid by other insurance, which allowed it to receive higher capitation payments. This prong was in place from September 2018 through December 2020.

As alleged, all three prongs violated applicable law and Centene's subsidiaries' contracts with state Medicaid agencies. The scheme worked: in 2017, the officers each received incentive payments ranging from $890,000 to $3.915 million.[17]

---

[17] Plaintiff has not alleged that these officers had any motivation for continuing the scheme after receiving their payments in 2017.

### C. Governance And Oversight

As of the filing of Plaintiff's complaint, Centene was managed by a thirteen-director board of directors. It is undisputed that seven are independent, outside directors. During the relevant time, the Board met at least quarterly. At each quarterly meeting, management presented an enterprise risk management report.[18] Those updates identified "critical" risks and categorized them, with categories including "Legal" and "Policy & Government Relations."[19]

The Board had three committees with relevant oversight responsibilities. The compliance committee was responsible for "oversight of all compliance activities of [Centene] with respect to all lines of business," including Medicaid.[20] To that end, the compliance committee was required to "assess the effectiveness of [Centene's] compliance program" at least once a year and "[r]eview the compliance program structure," "[r]emain informed about the compliance program outcomes, including audit results and governmental enforcement activities," and "[o]versee the management by [Centene] of overall compliance risks" as appropriate, among other things.[21] The committee was required to "report regularly to the Board."[22] It met at

---

[18] *E.g.*, Crawford Aff., Ex. 49 at -3588 to -3591, -3599, -3602, -3613.

[19] *E.g.*, *id.* at -3602, -3613.

[20] Crawford Aff., Ex. 7 § A.

[21] *Id.* §§ C(1), 2(i)–(ii), (vii).

[22] *Id.* § D(1).

9

least fifteen times between 2016 and 2021.[23] Centene produced no minutes for any of those meetings in connection with Plaintiff's books and records demand. The compliance committee reported to the Board at each of its quarterly meetings.

In furtherance of its mandate, the compliance committee oversaw an annual internal compliance assessment of Centene's state Medicaid plans.[24] Those assessments covered compliance with each subsidiaries' contract with the relevant state Medicaid agency, as well as compliance with applicable law.[25] They were conducted by a management-level corporate compliance team, who reported to the compliance committee.[26]

Second, Centene's audit committee was tasked with oversight of "the integrity of [Centene's] financial statements," Centene's "compliance with legal and regulatory requirements," and "the performance of [Centene's] internal audit function," among other things.[27] The internal audit was conducted by management, who would report its progress to the audit committee on a quarterly basis. The internal audit individually assessed each of Centene's state health plans, including

---

[23] Crawford Aff., Exs. 15, 17, 21, 31–32, 34, 39, 40, 54–57, 62–63; Crawford Reply Aff., Ex. 2.

[24] *E.g.*, Crawford Aff., Ex. 31, at -1179, -1185.

[25] Compl. ¶ 208.

[26] *See, e.g.*, Crawford Aff., Ex. 31 at -1185.

[27] Crawford Aff., Ex. 5 § A.

10

for what the relevant presentations describe as the "Top 20 Risks."[28]  KPMG, Centene's outside auditor, conducted an external audit, the results of which were reported to the audit committee.  Both audits were conducted on an annual basis.

The audit committee met at least twenty-one times between 2016 and 2021.[29] Centene produced only one set of meeting minutes for those meetings in connection with Plaintiff's books and records demand.  The audit committee reported to the Board at each quarterly meeting.

Finally, Centene's government and regulatory affairs committee was tasked with overseeing "'all compliance activities of [Centene] with respect to all lines of business,' including Medicaid, and 'all compliance functions,' to 'coordinate the Board's oversight of the performance of the Company's compliance function.'"[30]  At this stage, there is no record of the government and regulatory affairs committee meeting at any time between 2016 and 2021 or reporting to the Board.

---

[28] *E.g.*, Crawford Aff., Ex. 19 at -8357.

[29] Crawford Aff., Exs. 12–14, 20, 30, 33, 35–38, 46, 59, 60; Szustak Aff., Ex. 3. Compl. ¶¶ 127–28, 164.

[30] Compl. ¶ 77 (citation omitted) (footnote omitted).

**D.** **Regulators Take On Spread Pricing; Centene Begins An Enterprise-Wide Transition To Pass-Through Pricing; The Board Is Apprised Of Regulatory Risk And Management's Response.**

As of 2018, PBMs were experiencing a backlash against spread pricing. As presented by Plaintiff, the backlash began in relevant part with a January 2018 Ohio newspaper "publishing an investigative series on the influence of PBMs over the cost of prescription drugs, with a particular focus on how the largest PBMs, like [Caremark PBM], were engaging in aggressive spread pricing in connection with Ohio's Medicaid program at taxpayers' expense."[31]

In July, the Ohio attorney general issued a press release announcing that his office had been investigating PBMs generally and expressing an intent to bring litigation in the future. The Board met the same month and was informed an Ohio legislative committee had "held hearings on PBMs," and the committee and the Ohio Department of Medicaid were conducting "two separate audits on PBM spend."[32] The presentation explained that Centene anticipated its health plan would be "highlighted since [its] payment rates showed to be higher with [Caremark PBM]

---

[31] *Id.* ¶ 133.

[32] Crawford Aff., Ex. 24 at -5292.

12

than the other MCOs."[33] It also noted that the Ohio Department of Medicaid was going to require PBMs to move to a pass-through pricing model by January 2019.[34]

In response to this pressure, Centene "anticipat[ed] the need" to move all of its health plans to a pass-through pricing model.[35] To that end, in March 2018 Centene acquired an interest in RxAdvance, "a full-service" PBM.[36] The July Board presentation explained that the company "[d]eveloped [a] schedule to transition from [Caremark PBM] to RxAdvance during 2019/2020," which was set to "begin in the 4th quarter of 2018 in [Mississippi]."[37]

In October, PBM risk began appearing as part of the Board's quarterly enterprise risk management update.[38] The October update explained that "[c]ertain states are placing increased scrutiny around PBM regulation, and transparency of pharmacy rates."[39] The slide focused on the possibility that the resulting reputational harm and regulatory changes could force Centene to alter its business model, on additional scrutiny from "other regulatory bodies," and on "[r]eputational risk

---

[33] *Id.*

[34] *Id.*

[35] *Id.* at -5282.

[36] Crawford Aff., Ex. 23 at Ex. 99.1 at 1.

[37] Crawford Aff., Ex. 24 at -5282.

[38] Crawford Aff., Ex. 26 at -5997.

[39] *Id.*

13

resulting from negative publicity."[40]  The Board was informed that management's response was to use public relations and lobbying to "create good public policy."[41] The presentation also conveyed that the state plans were "engaged in affected markets."[42]  The Board was told the executives responsible for managing the risk included Brinkley, Burkhalter, and four others.[43]

The Board presentation also stated that the Ohio "PBM inquiry continues with Envolve Payment arrangement."[44]  The Board was specifically told that Centene "has pushed back aggressively to correct the record of potential 'double dipping' and demonstrate added value in [its] pharmacy model."[45]

The Board's February 2019 enterprise risk management update categorized PBM risk as a critical "Regulatory Environment/Reputational" risk.[46]  The directors were notified of an "[i]ncrease in [r]egulatory scrutiny" of Centene's "[PBM] model occurring across the country," with "significant regulatory inquiries currently

---

[40] *Id.* (emphasis omitted).

[41] *Id.* (emphasis omitted).

[42] *Id.*

[43] *Id.*

[44] *Id.* at -5935.

[45] Crawford Aff., Ex. 24 at -5282.  It is reasonable to infer that the reference to "double dipping" referred to the Cost Reporting Scheme, specifically the prong that reported expenditures paid by other insurance; this phrase assured the Board that no such "double dipping" was occurring.

[46] Crawford Aff., Ex. 25 at -4594, -4598.

14

occurring in Indiana and Georgia," in addition to those in Ohio.[47]  The Board was also told for the first time that the PBM regulatory inquiries could result in "Harmful Legal & Regulatory Updates," and the Board was told for the first time that Centene was at risk of "Government Contract Non-Performance."[48]  As in October, the Board was informed that management was addressing this risk through lobbying and public relations.[49]

Also in February, the corporate compliance team informed the compliance committee that it developed a new tool "to bring additional rigor to its oversight of

---

[47] *Id.* at -4594 (emphasis omitted).  The presentation uses the phrase "legacy PBM model." *Id.*  The phrase is not defined in the highly redacted Board presentation, nor were Board minutes produced that give context to the phrase.  I understand the defendants would have me infer the phrase refers to the use of spread pricing, with the adjective "legacy" conveying that the model was transitioning out of use.  That is a reasonable inference.  But following the Health Net merger, Centene incorporated two additional layers of subcontracting with two other PBMs into each Medicaid plan's payment structure.  It is also reasonable to infer that "PBM model" refers this subcontracting of PBM functions to multiple other PBMs, including Caremark PBM.  It is also reasonable to infer that "legacy" does not mean the model was not in use, and that a "legacy model" could indicate Centene incorporated newer structures in some states.  At this stage, I must draw all reasonable inferences in Plaintiff's favor:  I interpret "legacy PBM model" to refer only to a PBM model that is no longer in use or that is transitioning out of use.

[48] *Id.* at -4598.  The plaintiff-friendly inference is that these phrases refer to potential adverse legal consequences and the potential for Centene's subsidiaries to breach their Medicaid contracts.

[49] *Id.*  Another slide notes that the transition to RxAdvance was anticipated to mitigate risk relating to the use of spread pricing.  *Id.* at -4594 ("RxAdvance's model anticipated to mitigate PBM risk.").  The presentation does not clarify whether the referenced "PBM risk" concerns public concerns over the use of spread pricing, compliance with applicable law, or something else.  And the defendants have not attached Board minutes contextualizing the comment.  The plaintiff-friendly inference is that RxAdvance was offered as a solution only to spread pricing as a controversial practice and not to anything illegal.

15

the health plan compliance programs."[50] The committee was told that the tool would be used as part of the 2019 corporate compliance assessment.[51]

### E. Regulatory Scrutiny Continues And The Board Is Informed That KPMG Was Subpoenaed; The Compliance Committee Learns Of Deficiencies In Its Health Plan Compliance Evaluation.

Against the backdrop of regulatory scrutiny into spread pricing, the Ohio attorney general began to focus on Centene's PBM operations. Over the coming months, the Board would receive only cursory updates on the issue, with assurances that management was handling the problem. Plaintiff is adamant the Board never received actual notice of the Cost Reporting Scheme.

On April 22, KPMG told the audit committee that the Ohio attorney general "would be issuing a grand jury subpoena requesting the [Centene Ohio MCO] audit working papers for 2016, 2017, and perhaps 2018."[52] The Board met the following day.[53] It received a report from the audit committee, and Plaintiff asks the Court to infer that as part of this update the audit committee informed the Board of the KPMG subpoena.[54] The Board was also told for the first time that the "Ohio Attorney General has signaled [an] intent to sue Medicaid PBMs," a reference to the attorney

---

[50] Crawford Aff., Ex. 31 at -1185.

[51] *Id.*

[52] Szustak Aff., Ex. 14 at -2963.

[53] Crawford Aff., Ex. 22.

[54] *Id.* at -4792.

general's July 2018 announcement.[55]   The Board was again apprised of the regulatory scrutiny of Centene's PBM business and of management's response of transitioning to pass-through pricing and a public relations and public policy response.[56]

The Board next met in July.[57]   It was told Centene's PBM operations continued to face regulatory scrutiny and that the company faced the risk of possible adverse legal action.[58]   The Board was informed of the same management-led solutions.[59]   The Board also received a "legal services" report from Centene's general counsel.[60]   Only one bullet point from that update survived Centene's redactions:   "Responding to Ohio Attorney General's investigation of pharmacy pricing issues."[61]

The compliance committee met in October.[62]   It received an update on Centene's health plan compliance evaluation, and was informed that "[c]ommon findings included . . . [d]eficiencies in the quality and completeness of contract and

---

[55] *Id.* at -4901.

[56] *Id.* at -4946.

[57] Crawford Aff., Ex. 27.

[58] *Id.* at -5165, -5171.

[59] *Id.* at -5171.

[60] *Id.* at -5220.

[61] *Id.*

[62] Crawford Aff., Ex. 32.

regulatory assessments," "[i]nsufficient and/or untimely finding/risk remediation," and "[i]nsufficient Compliance Committee oversight of core compliance activities."[63] This was the first time these sorts of findings appear in the record, and it appears they were uncovered by the new compliance tool developed in the fourth quarter of 2018. The committee was informed that the company would "[s]hare best practices and develop new guidance materials and resources for plans to address common findings" and "monitor[] remediation of issues identified within the evaluations."[64] The committee was further informed that the compliance team would continue to revise and refine the new compliance tool for the 2020 assessment.[65]

In October, the Board was informed of a "[s]ignificant increase in regulatory scrutiny" of its PBM model.[66] The Board was again informed that scrutiny created a risk of "Harmful Legal & Regulatory Updates."[67] In addition to being updated on the transition to RxAdvance, the Board was informed of a public policy and public relations response.[68]

---

[63] *Id.* at -0969.

[64] *Id.*

[65] *Id.*

[66] Crawford Aff., Ex. 28 at -3777.

[67] *Id.* The Board also received a legal services update, but the relevant page is fully redacted. *Id.* at -3860. Absent any language suggesting the legal services update concerned the backlash to spread pricing or the Cost Reporting Scheme, the plaintiff-friendly inference is that these matters were not discussed in the report.

[68] *Id.* at -3727 to -3728, -3777.

18

The compliance committee met in February 2020.[69]  It received the final results of the 2019 health plan compliance assessment, which reiterated the earlier findings concerning Centene's shortcomings.[70]  The presentation noted additional remedial actions taken in response to those findings.[71]

The Board also met in February.[72]  As part of the enterprise risk management report, it was informed of a "[s]ignificant increase in regulatory scrutiny of [Centene's] PBM business model occurring in several states."[73]  It was told Centene faced a risk of "Harmful Legal & Regulatory Updates" arising from this scrutiny.[74]  Management again described a public relations and public policy response.[75]  As part of a separate report, the Board was informed that Centene was "providing feedback to plans on state specific bills," "develop[ing] [a] comprehensive toolkit to assist the Health Plans," and "completing impact analyses on the effects of carve-out[s] and the value of pharmacy" in response to state scrutiny of "PBM price transparency."[76]

---

[69] Crawford Aff., Ex. 34.

[70] *Id.* at -0818.

[71] *Id.*

[72] Crawford Aff., Ex. 42.

[73] *Id.* at -3375.

[74] *Id.*

[75] *Id.*

[76] *Id.* at -3294.

**F.** **In April 2020, Centene Begins Acknowledging A Separate Legal Risk Related To Its PBM Operations.**

In April, the Board met and received another enterprise risk management report.[77]  It was notified of a "[c]ontinued increase in regulatory scrutiny of [Centene's] PBM business model occurring in several states."[78]  An appendix to the presentation categorized the PBM risk as a "Policy & Government Relations" risk, and noted the possibility of "Harmful Legal & Regulatory Updates."[79]  Another slide in the appendix noted a related legal risk concerning PBM scrutiny, namely a "[c]ontinued risk of governmental focus related to PBMs."[80]  This was the first time the PBM matter was presented as a separate "legal" risk, as historically the enterprise risk management report categorized PBM risk as a policy, regulatory, or reputational risk.  The slide mentions the risk of litigation, and notes that "[s]enior management [is] actively working to mitigate legal exposures and to take corrective action to lessen future legal risk."[81]

---

[77] Crawford Aff., Ex. 49 at -3588.

[78] *Id.* at -3591.

[79] *Id.* at -3602.  Though this information appeared in an appendix, it is reasonable to infer that it was presented to the Board along with the rest of the Board slides.  To the extent that inference is unreasonable, it does not affect my conclusion because it is reasonable to infer at the pleading stage that the slides were provided to the Board.

[80] *Id.* at -3613.

[81] *Id.*

In July the Board received a legal update on the Ohio attorney general's investigation and Centene's general counsel "reviewed the history of the matter."[82] The balance of the discussion is redacted, presumably at least in part for privilege.

The compliance committee also met in July.[83] It received a second quarter update on the 2020 health plan program evaluation, with eight plans having been evaluated to date.[84] Among other things, it informed the committee that common findings thus far included "[c]ontinued deficiencies in the quality and completeness of Medicaid contract assessments," which was 'a repeat issue from 2019."[85] That was the only issue identified as a repeat issue from the year before. The slide also identified "[c]ommon areas of improvement" based on the review to date.[86]

### G. The Board Is Informed Of The Potential For Legal Action In Multiple States.

In October 2020, the Board was informed that the legal scrutiny around Centene's PBM model was continuing.[87] A slide in an appendix to the enterprise risk management report again presented the PBM matter as a legal risk, explaining PBMs "continue to be a concern," and that "[r]egulatory inquiries in OH, GA, MS

---

[82] Crawford Reply Aff., Ex. 4 at -7314.

[83] Crawford Reply Aff., Ex. 2.

[84] *Id.* at -0919.

[85] *Id.*

[86] *Id.*

[87] Crawford Aff., Ex. 58.

21

and NM are ongoing."[88] This was the first time the directors were informed that the regulatory inquiries had spread to Mississippi and New Mexico. As part of this update, the Board was informed of a "Litigation and Regulatory Risk."[89] As with the other Board presentations, the slide notes that "[s]enior management [is] actively working to mitigate legal exposures and to take corrective action to lessen future legal risk."[90] It also noted that "Centene['s] leadership and Government Affairs team [are] communicating strategies with applicable state markets."[91]

As part of the October meeting, the Board received a legal services report.[92] The unredacted portion of the report flagged two risks relating to PBMs.[93] First, that the "[r]egulatory investigation continues in Ohio, where [the] Ohio Attorney General has continued to seek additional materials around PBM activities."[94] Second, that a "[p]laintiffs' law firm continues investigations in Ohio, Mississippi, New Mexico, and Georgia, and suggests they [sic] intend to conduct contractual adherence investigations in additional states."[95] This report notified the directors for the first

---

[88] *Id.* at -5625.

[89] *Id.*

[90] *Id.*

[91] *Id.*

[92] *Id.* at -5797 to -5798.

[93] *Id.* at -5798.

[94] *Id.*

[95] *Id.*

22

time that, in addition to the ongoing regulatory inquiries, Centene also faced the risk of litigation by private parties.

The compliance committee also met in October 2020.[96] It received a third quarter update on the 2020 health plan compliance evaluation, at which point Centene evaluated fifteen health plans.[97] As with the July update, the presentation noted the common findings included "[d]eficiencies in the quality and completeness of Medicaid contract assessments."[98] And as with other updates, it noted "[c]ommon areas of compliance program improvement."[99]

The Board met again in February 2021.[100] The Board received an enterprise risk management report that categorized the PBM matter as a legal risk, and was informed that PBMs "continue to be a steady state concern."[101] The same slide explained that "[s]enior management [is] actively working to mitigate legal exposures and to take corrective action to lessen future legal risk."[102]

---

[96] Crawford Aff., Ex. 39.

[97] *Id.* at -3224.

[98] *Id.*

[99] *Id.*

[100] Crawford Aff., Ex. 41.

[101] *Id.* at -6603 (emphasis omitted).

[102] *Id.* The Board was also given a legal services report that is fully redacted other than the title, which reads "Legal Services" and gives the general counsel's name and title. *Id.* at -6622. The plaintiff-friendly inference is that the legal services report did not discuss the PBM matter.

23

Also in February, the compliance committee again received a health compliance program evaluation report for the completed 2020 evaluation.[103] The update noted deficiencies common across health plans, including deficiencies in the "[q]uality and completeness of Medicaid contract assessments," and improvements that were made to address those shortcomings.[104]

### H. Centene Is Sued For The Cost Reporting Scheme; The Board Is Notified And Responds.

On March 11, the Ohio Department of Medicaid and Ohio Attorney General filed an action "against Centene, [its Ohio MCO subsidiary], and Envolve alleging breach of contract, violations of Ohio healthcare law, and conspiracy to violate Ohio healthcare law."[105] In substance, the Ohio complaint alleged that Centene, acting through its Ohio MCO subsidiary and Envolve, secretly carried out all three prongs of the Cost Reporting Scheme in Ohio.

The Board learned of the Ohio complaint at its April meeting.[106] It was told that the complaint was "unfounded" and that "Envolve [would] aggressively defend the integrity of the pharmacy services provided to the State of Ohio."[107] The same presentation explained the lawsuit affected Centene's Ohio MCO bidding on a

---

[103] Crawford Aff., Ex. 40 at -3296.

[104] *Id.*

[105] Compl. ¶ 211; Szustak Aff., Ex. 20.

[106] Crawford Aff., Ex. 43 at -7561.

[107] *Id.*

24

Medicaid contract, and that the contract would be "neither awarded nor denied . . . pending the resolution of the Attorney Generals [sic] lawsuit."[108] The relevant presentation mentioned "PBM lawsuits in other states such as Mississippi" as an "Area[] of Continued Focus," supporting the inference that the Board had previously been informed that there were other legal actions filed concerning Centene's PBM activities.[109] Plaintiff has pled particularized facts suggesting these lawsuits were filed in, at most, three other states.

The Board also received an enterprise risk management report, which noted the legal PBM risk "continues to escalate" due to "threatened [civil litigation] in Mississippi, Georgia, New Mexico and potentially elsewhere."[110] The presentation described an "[a]ction [p]lan."[111] The substance of the action plan is redacted. This is presumably for privilege, meaning the Court cannot draw plaintiff-friendly inferences from the redactions.[112] As with previous Board presentations, the presentation conveyed that "[s]enior management [was] actively working to mitigate legal exposures and to take corrective action to lessen future legal risk."[113] The

---

[108] *Id.* at -7538, -7576.

[109] *Id.* at -7576.

[110] *Id.* at -7607.

[111] *Id.* at -7605.

[112] *Ontario Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 2023 WL 3093500, at *4 (Del. Ch. Apr. 26, 2023) (citing D.R.E. 512(a)).

[113] Crawford Aff., Ex. 43 at -7614.

Board was further informed of a public relations and public policy response.[114] The Board was also informed that the attorney general's lawsuit could affect "current and upcoming Requests for Proposals . . . in other states."[115]

The following month, the Board was informed that Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") had been retained to investigate legal issues concerning Centene's PBM operations.[116] The Board separately retained the law firm Jenner & Block, LLP ("Jenner") to serve as its counsel in connection with the PBM investigation.[117]

## I. Skadden's Investigation Continues While Centene Negotiates Settlements With Twenty-Two States.

Centene began suffering more concrete consequences from the Cost Reporting Scheme. In June, Centene and its subsidiaries settled the Ohio litigation for $88.3 million.[118] The settlement "required [Centene] to commit to 'full transparency' concerning 'the exact amount paid to the pharmacy for each pharmaceutical claim.'"[119] Also in June, Centene settled the threatened litigation by

---

[114] *Id.* at -7610.

[115] *Id.* at -7606.

[116] Crawford Aff., Ex. 45 at -7305.

[117] *See* Crawford Aff., Ex. 46 at -1914 (noting Jenner's attendance at meeting).

[118] Szustak Aff., Ex. 18.

[119] Compl. ¶ 217 (quoting Szustak Aff., Ex. 18 ¶ 7).

Mississippi's attorney general for $55.5 million. The Ohio and Mississippi settlements required Centene to transition off RxAdvance.[120]

In July, the Board received an enterprise risk management report.[121] The report included far more detail than previous presentations on PBM risk and efforts Centene was taking to address it.[122] It explained that the PBM risk level decreased "due to proactive PBM messaging and settlements."[123] The Board also received a "Business Strategy Report," which detailed the earlier settlements, changes the company was making in response to those settlements, and the company's progress in making those changes.[124] And the Board received a legal services report concerning the settlements.[125] Also in July, Hunter, who was one of the officers alleged to have carried out the Cost Reporting Scheme, "abruptly resigned from" Centene.[126] It is reasonable to infer his resignation was related to the fallout from the Cost Reporting Scheme.

---

[120] Crawford Aff., Ex. 48 at -6762.

[121] *Id.* at -6711.

[122] *Id.* at -6713 to -6719.

[123] *Id.* at -6713.

[124] *Id.* at -6752 to -6755, -6761 to -6765.

[125] *Id.* at -6920.

[126] Compl. ¶ 116.

At a September meeting, Jenner informed the audit committee that Skadden "completed a thorough review of the PBM situation."[127] After receiving that information, the committee "instructed Skadden to broaden its review of certain issues."[128] The committee also supported disciplinary action in connection with the PBM investigation: terminating Schwaneke, an officer alleged to have carried out the scheme.[129] It is reasonable to infer that Schwaneke was terminated for his involvement in the Cost Reporting Scheme.

That same month, the Board met and Neidorff shared Skadden's findings.[130] Neidorff also informed the Board of Schwaneke's termination.[131] The directors asked questions and discussed the forgoing.[132]

At an October 2021 Board meeting, Jenner reported that it conducted a review of Skadden's work, and concluded it was "thorough and complete in nature."[133] The Board also received an update "regarding the PBM matter" and asked questions concerning the same.[134]

---

[127] Crawford Aff., Ex. 46 at -1914 to -1915.

[128] *Id.* at -1915.

[129] *Id.*

[130] Crawford Aff., Ex. 50.

[131] *Id.*

[132] *Id.*

[133] Crawford Aff., Ex. 51 at -7682.

[134] *Id.*

The fallout continued. Between September 2021 and November 2022, Centene entered eleven additional settlements concerning the Cost Reporting Scheme, agreeing to pay out $596 million. As of the filing of Plaintiff's complaint, Centene was "finalizing settlements with nine other states."[135] It "recorded a legal settlement reserve of $1.25 billion" relating to the Cost Reporting Scheme.[136]

## J. This Litigation

Plaintiff made a demand to inspect Centene's books and records in December 2021. Centene produced documents and certified its production was complete.[137] Plaintiff filed its complaint in this action in December 2022 naming as defendants Centene directors Orlando Ayala, Jessica L. Blume, Kenneth A. Burdick, H. James Dallas, Frederick H. Eppinger, Richard A. Gephardt, Lori J. Robinson, and William Trubeck (collectively the "Director Defendants"). Plaintiff also named as defendants in their capacity as Centene officers Brinkley, Burdick, Brandy Burkhalter, Hunter, and Schwaneke (the "Officer Defendants," and together with the Director Defendants, "Defendants").

---

[135] Compl. ¶ 227. Plaintiff's answering brief contends that Centene paid $936 million "thus far." D.I. 29 at Ans. Br. 32 [hereinafter "PAB"]. The difference between this amount and the amount stated in the complaint appears attributable to settlements entered into after Plaintiff filed its complaint. I do not consider these additional settlements. *Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l Fund, L.P.*, 829 A.2d 143, 155 (Del. Ch. 2003) ("Parties may not amend the pleadings through briefing on a motion to dismiss.").

[136] Crawford Aff., Ex. 2 at 50.

[137] Compl. ¶ 45.

Plaintiff's complaint asserts three counts. Count I asserts duty of oversight, or *Caremark*, claims against the Director Defendants. Within Count I, Plaintiff advances two *Caremark* theories springing from three related oversight failures: (1) failing to make a good faith effort to "implement and monitor compliance policies and systems" to monitor compliance with applicable law;[138] (2) ignoring red flags indicating that Centene and its subsidiaries were not complying with applicable law. Through Count I, Plaintiff seeks to hold the Director Defendants liable for damages Centene suffered, "both financially and to its corporate image, reputation, and goodwill."[139]

Count II asserts the Officer Defendants "violated their corporate responsibilities by knowingly operating and maintaining an illegal business model."[140] Count II also asserts a claim for breach of fiduciary duty based on the failure to "inform the Board about the illegal nature of the Cost Reporting Scheme."[141] Through Count II, Plaintiff seeks to redress the same injuries outlined in Count I.

Count III asserts an unjust enrichment claim against the Officer Defendants alleging they were unjustly enriched by their receipt of "profits, benefits, and other

---

[138] *Id.* ¶ 266.

[139] *Id.* ¶ 269.

[140] *Id.* ¶ 275.

[141] *Id.* ¶ 278.

compensation from Centene, including incentive compensation based, at least in part, on their wrongful efforts to implement the Cost Reporting Scheme."[142]

Defendants moved to dismiss under Court of Chancery Rule 23.1 for failure to plead demand was futile and under Rule 12(b)(6) for failure to state a claim.

## II.    ANALYSIS

Defendants seek dismissal on the grounds that Centene's current Board can impartially decide whether to bring claims against not only the officers who perpetuated the Cost Reporting Scheme, but also the directors on whose watch it occurred.  Plaintiff has taken on the heavy burden of pleading with particularity that the current Board cannot be impartial because a majority of its directors themselves face a substantial likelihood of liability for bad faith dereliction of their duty of oversight in not making a good faith effort to establish an information system to oversee Medicaid compliance, and not responding to red flags.  I conclude Plaintiff has fallen short.

Under Court of Chancery Rule 23.1, a derivative complaint must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's

---

[142] *Id.* ¶ 282.

failure to obtain the action or for not making the effort."[143]  A stockholder may pursue a derivative claim on behalf of a corporation only if either:  "(a) she has first demanded that the directors pursue the corporate claim and they have wrongfully refused to do so; or (b) such demand is excused because the directors are deemed incapable of making an impartial decision regarding the pursuit of the litigation."[144] Plaintiff did not make a demand and therefore the complaint "must be dismissed unless it alleges particularized facts showing that demand would have been futile."[145] In *Zuckerberg*, our Supreme Court adopted a three-part demand futility test.[146]  It asks the following on a director-by-director basis:

---

[143] Ct. Ch. R. 23.1(a) (2007).  Rule 23.1 was amended on September 25, 2023.  *In re: Amendments to Rules 7, 10, 17–25, and 171 of the Court of Chancery Rules, Sections, III, IV, and XVI* (Del. Ch. Sept. 25, 2023) (ORDER).  No substantive revisions were made to the relevant portion of Rule 23.1.  *Id.* at 29.  Rule 23.1 was again amended on June 14, 2024, and again no substantive revisions were made to the relevant portion.  *In re: Amendments to Rules 1–6, 8, 9, 11–15, 23, 23.1, 79, 79.1, 79.2 and 174 of the Court of Chancery Rules, Section I, II, III, IV, X, and XVI* at 59 (Del. Ch. May 31, 2024) (ORDER). Nevertheless, I proceed under the Rules as they were drafted at the time this action was filed.  *See Lebanon Cnty. Emps'. Ret. Fund v. Collis*, 311 A.3d 773, 780 n.19 (Del. 2023).

[144] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004).

[145] *Ryan v. Gursahaney*, 2015 WL 1915911, at *5 (Del. Ch. Apr. 28, 2015), *aff'd*, 128 A.3d 991 (Del. 2015).

[146] *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021).

(i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;

(ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and

(iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[147]

"If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile."[148] "Demand futility is 'conducted on a claim-by-claim basis.'"[149]

Plaintiff attempts to plead demand is futile on the basis that more than half of the demand board faces a substantial likelihood of liability due to bad faith breaches of their duty of oversight. That duty sounds in the fiduciary duty of loyalty, and specifically its subsidiary element of bad faith.[150] Plaintiff has attempted to plead two stripes of oversight claims, alleging the Director Defendants acted in bad faith by failing to create systems to convey information to the Board, and by failing to respond to information they received. The demand board is comprised of thirteen

---

[147] *Id.*

[148] *Id.*

[149] *In re Vaxart, Inc. S'holder Litig.*, 2021 WL 5858696, at *15 (Del. Ch. Dec. 1, 2021) (quoting *Cambridge Ret. Sys. v. Bosnjak*, 2014 WL 2930869, at *4 (Del. Ch. June 26, 2014)).

[150] *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 369–70 (Del. 2006).

directors, so Plaintiff must plead seven face a substantial likelihood of liability. It named only eight directors as defendants, and therefore concedes demand is not futile as to five.

### A. Plaintiff Failed To Plead Demand Is Futile As To Its Information Systems Claim.

I begin with Plaintiff's information systems claim against the Director Defendants. To satisfy its duty of oversight, "the board must make a good faith effort—*i.e.*, try—to put in place a reasonable board-level system of monitoring and reporting."[151] Thus, an information systems analysis focuses on whether the plaintiff pled facts from which the court can infer the director defendants "made no effort to put in place a board-level compliance system"[152] or utterly failed "to assure a reasonable information and reporting system exists."[153] "[O]ur case law gives deference to boards and has dismissed *Caremark* cases even when illegal or harmful company activities escaped detection," so long as "the plaintiffs have been unable to plead that the board failed to make the required good faith effort to put a

---

[151] *Id.* at 821; *see also id.* ("[T]o satisfy their duty of loyalty, directors must make a good faith effort to implement an oversight system and then monitor it.").

[152] *Id.*; *see also Stone*, 911 A.2d at 370 ("We hold that *Caremark* articulates the necessary conditions predicate for director oversight liability: (a) the directors utterly failed to implement any reporting or information system or controls . . . . .").

[153] *Stone*, 911 A.2d at 372 (internal quotation marks omitted) (quoting *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 971 (Del. Ch. 1996)).

reasonable compliance and reporting system in place."[154]  And "Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so."[155] The Court must remain "conscious of the need to prevent hindsight from dictating the result of a *Caremark* action; a bad outcome, without more, does not equate to bad faith."[156]

Still, having the "trappings of oversight"[157] will not necessarily foreclose an information systems claim where those systems are "woefully inadequate" or do not put "meaningful controls in place."[158]  To that end, our courts have concluded a *Caremark* claim may be pled by alleging "the company had an audit committee that met only sporadically and devoted patently inadequate time to its work, or that the audit committee had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation."[159]

Defendants moved to dismiss on the basis that Centene had a rigorous system for monitoring Medicaid compliance and reporting deficiencies to the Board.

---

[154] *Marchand v. Barnhill*, 212 A.3d 805, 821 (Del. 2019).

[155] *Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007).

[156] *Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963, 980 (Del. Ch. 2013).

[157] *Hughes v. Xiaoming Hu*, 2020 WL 1987029, at *16 (Del. Ch. Apr. 27, 2020).

[158] *Rich*, 66 A.3d at 982–82 (emphasis omitted).

[159] *Hughes*, 2020 WL 1987029, at *14 (internal quotation marks omitted) (quoting *Guttman v. Huang*, 823 A.2d 492, 507 (Del. Ch. 2003)).

Plaintiff has not pled, or even argued, that Centene lacked an adequate oversight framework on paper. Instead, Plaintiff relies on a line of cases concluding the existence of such systems does not foreclose an information systems claim where the board knows they are inadequate.[160] My analysis focuses on whether a majority of the demand board had such knowledge.[161]

Plaintiff attempts to plead board-level awareness with allegations sweeping from February 2017 to February 2021. But to plead that a majority of the demand board faces a substantial likelihood of liability for this claim, Plaintiff must plead Dallas, Robinson, and Trubeck knew of the relevant deficiencies.[162] Though Robinson joined the Board in late 2019, Dallas and Trubeck joined the Board in January 2020. Plaintiff does not allege, even in conclusory fashion, that these directors were brought up to date on earlier alleged oversight shortcomings. Therefore, the analysis hinges on information the Board received after January 2020.

---

[160] *Id.* at *14–16; *Rich*, 66 A.3d at 982–83; *see also Constr. Indus. Laborers Pension Fund v. Bingle*, 2022 WL 4102492, at *12 (Del. Ch. Sept. 6, 2022) ("This inference I find unwarranted. To be sure, nominal acts of delegation, such as delegating oversight responsibility to a Board subcommittee that failed to meet, or that failed to investigate serious misconduct after being put on notice, are not preclusive of an oversight claim."), *aff'd*, 297 A.3d 1083 (Del. 2023).

[161] *See Marchand*, 212 A.3d at 824 (reasoning *Caremark* requires "that a board make a *good faith effort* to put in place a reasonable system of monitoring and reporting about the corporation's central compliance risks" (emphasis added)).

[162] If Plaintiff pleads Burdick faces a substantial likelihood of liability, the math leaves Plaintiff having to plead two of these three do as well. Dallas and Trubeck were identically situated, having joined the Board at the same time and served on neither the audit committee nor the compliance committee.

36

Within that narrowed timeframe, Plaintiff points to information received at four compliance committee meetings and focuses exclusively on information the committee received as part of the annual health plan compliance program evaluation.[163] Centene's corporate compliance team provided the compliance committee with quarterly updates on the company's health plan compliance program evaluation.[164] That assessment encompassed compliance with each health plan's Medicaid contract as well as legal and regulatory compliance.[165] Plaintiff relies on findings common across all of Centene's health plans reported in October 2019 (which it alleges was shared with the full Board in 2020[166]), February, July, and October 2020, and February 2021, including "[d]eficiencies in the quality and completeness of contract and regulatory assessments."[167] At each meeting, the

---

[163] PAB 37.

[164] *E.g.*, Crawford Aff., Ex. 34 at -0818.

[165] *See, e.g.*, Crawford Aff., Ex. 54 at -1465 ("Assessments ensure there are processes, policies and procedures in place to address contract requirements."); Crawford Aff., Ex. 55 at -1751 (displaying chart relating to health plan compliance assessment titled "Contract and Law/Reg Compliance Status as of July 6, 2017").

[166] Compl. ¶ 176.

[167] Crawford Aff., Ex. 32 at -0969; Crawford Aff., Ex. 34 at -0818; Crawford Reply Aff., Ex. 2 at -0919; Crawford Aff., Ex. 39 at -3243; Crawford Aff., Ex. 40 at -3296. Plaintiff identifies others. PAB 37–38 (identifying reports of "(i) 'deficiencies in the quality and completeness of Medicaid contract assessments (a repeat issue from 2019)'; (ii) 'Insufficient compliance committee oversight of core compliance activities'; (iii) 'Compliance performing non-compliance functions'; (iv) 'Failure to document governance body actions and activities . . . within meeting minutes'; (v) 'Insufficient and/or untimely finding/risk remediation, including inadequate root cause analysis, insufficient

compliance committee was expressly informed of specific measures management was taking or had taken to address each of the shortcomings identified for the compliance committee.[168]

From there, Plaintiff infers the compliance committee shared these deficiencies with the full Board. This is based on the fact the committee reported to the Board at its February 2020, October 2020, and February 2021 meetings.[169] This is a significant inference. But if I were to make it, it would be unreasonable to infer the committee did not also inform the Board of the actions taken to address those deficiencies. And so even accepting Plaintiff's requested inference, the Board oversaw improvements to Centene's Medicaid compliance systems for as long as it was aware of the deficiencies at the heart of Plaintiff's claim. This falls far short of a showing that the directors "turned a blind eye" to problems with its reporting systems or knew that Centene effectively had no controls in place.[170] Plaintiff failed

---

preventative remediation plans, failing to provide ongoing remediation status updates, and failing to ensure contract assessments reflect current compliant/non-compliant status;' and (vi) 'Inadequate documentation/investigation of root cause of findings, and remediation plans.'" (alteration in original) (citations omitted)).

[168] Crawford Aff., Ex. 32 at -0969; Crawford Aff., Ex. 34 at -0818; Crawford Aff., Ex. 39 at -3243; Crawford Reply Aff., Ex. 2 at -0919; Crawford Aff., Ex. 40 at -3296.

[169] Crawford Aff., Ex. 42 at -3226; Crawford Aff, Ex. 58 at -5453; Crawford Aff., Ex. 41 -6411.

[170] *Hughes*, 2020 WL 1987029, at *14; *Rich*, 66 A.3d at 982–83 (concluding the company "had no *meaningful* controls in place"). Notably, the record demonstrates that these deficiencies were uncovered only after Centene improved its health plan compliance assessment.

to establish that a majority of the demand Board knew Centene lacked reasonable compliance systems and failed to make a good faith effort to implement a reasonable system.

Plaintiff's fallback argument swings for the fences: it asks the Court to infer bad faith from the mere absence of any Board or committee discussion of Medicaid compliance, given the extent to which Centene's revenue depended on its Medicaid business.[171] In *Marchand v. Barnhill*, the Delaware Supreme Court identified specific circumstances compelling the "inference that a board has undertaken no efforts to make sure it is informed of a compliance issue intrinsically critical to the company's business operation," which in turn "support[ed] an inference that the board has not made the good faith effort that *Caremark* requires."[172] The Supreme Court considered six facts supporting such a conclusion, only one of which was an absence of regular board-level discussions on the relevant topic:

---

[171] The complaint alleges 67% of Centene's revenue derived from its Medicaid business. For purposes of this motion, I assume that allegation is well pled.

[172] 212 A.3d 805, 822 (Del. 2019).

39

- no board committee that addressed food safety existed;

- no regular process or protocols that required management to keep the board apprised of food safety compliance practices, risks, or reports existed;

- no schedule for the board to consider on a regular basis, such as quarterly or biannually, any key food safety risks existed;

- during a key period leading up to the deaths of three customers, management received reports that contained what could be considered red, or at least yellow, flags, and the board minutes of the relevant period revealed no evidence that these were disclosed to the board;

- the board was given certain favorable information about food safety by management, but was not given important reports that presented a much different picture; and

- the board meetings are devoid of any suggestion that there was any regular discussion of food safety issues.[173]

In *In re Boeing Company Derivative Litigation*, all those same circumstances were present and compelled the same inference of bad faith.[174]

Even assuming it is reasonable to infer neither the Board nor its committees discussed Medicaid compliance from January 2020 through April 2021, this alone is not enough for the Court to conclude a board of directors acted in bad faith—Plaintiff has not painted the extreme picture present in *Marchand* and *Boeing*. On the contrary, Centene had three committees responsible for overseeing Medicaid

---

[173] *Id.*

[174] 2021 WL 4059934, at *26 (Del. Ch. Sept. 7, 2021).

compliance; the record shows two did real work and reported to the full Board. Management was required to report quarterly to the compliance committee on the company's annual health plan compliance assessment, which encompassed compliance with each health plan's Medicaid contract as well as legal and regulatory compliance.[175] Management conducted an annual internal audit and reported to the Board on a quarterly basis. The internal audit likewise covered Medicaid compliance.[176] The full Board regularly received enterprise risk management reports, which identified key risks, and many of those presentations specifically discussed risks pertaining to the company's PBM operations.[177] And Plaintiff did not adequately plead any red flags management was aware of that did not reach the Board.[178]

Plaintiff has not pled facts supporting an inference that the Director Defendants failed to make a good faith effort to establish a reasonable reporting

---

[175] *See supra* note 165.

[176] Compl. ¶ 208.

[177] *E.g.*, Crawford Aff., Ex. 49 at -3613.

[178] Plaintiff points out that the Ohio attorney general's announcement did not reach the Board until much later. Dallas, Trubeck, and Robinson were not on the Board when it was informed of it. Therefore, this fact could not serve as a red flag.

system.  Plaintiff failed to plead a majority of the demand board faces a substantial likelihood of liability on this basis.[179]

### B.    Plaintiff Failed To Plead Demand Is Futile As To Its Red Flags Claim.

I now turn to Plaintiff's argument that a majority of the demand board faces a substantial likelihood of liability for ignoring reports of legal risks in connection with Centene's PBM operations.  Directors are liable for an oversight failure where they implemented a reporting system or controls, but "consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."[180]  This claim can be pled by "alleging that the board's information system generated red flags indicating wrongdoing to which the directors failed to respond."[181]  "Typically . . . the red flag analogy depicts events or reports that serve as warning signs to the Board of corporate wrongdoing after a system of reporting and compliance is in place."[182]

---

[179] Plaintiff also contends that Centene's fraud, waste, and abuse policy applied only externally and not internally and that Centene's internal audit did not encompass Envolve during the relevant period.  Even if Plaintiff is correct as to both points, it would not disturb my conclusion that it failed to plead the Director Defendants acted in bad faith.

[180] *Stone*, 911 A.2d at 370.

[181] *In re McDonald's Corp. S'holder Deriv. Litig.*, 291 A.3d 652, 676 (Del. Ch. 2023).

[182] *Horman v. Abney*, 2017 WL 242571, at *11 (Del. Ch. Jan. 19, 2017).

Generally, "'red flags' are a proxy for pleading knowledge."[183]  Whether an

event or report is a red flag depends on context.[184]  Where the plaintiff's claim centers

on violations of law, an event must have sufficient nexus with the underlying

wrongdoing to serve as a red flag.[185]  At the pleading stage, that nexus exists where

---

[183] *See In re Gen. Motors Co. Deriv. Litig.*, 2015 WL 3958724, at *16 (Del. Ch. June 26, 2015), *aff'd sub nom. In re Gen. Motors Co. Deriv. Litig.*, 133 A.3d 971 (Del. 2016).

[184] *See, e.g.*, *Rojas ex rel. J.C. Penney Co., Inc. v. Ellison*, 2019 WL 3408812, at *13 (Del. Ch. July 29, 2019) (explaining the "sheer amount" of a settlement payment "and the posture of the case when it settled are far from sufficient in the context of the overall circumstances to support the inference of scienter necessary to demonstrate that [the company's] directors acted in bad faith").

[185] *See Clem v. Skinner*, 2024 WL 668523, at *9 (Del. Ch. Feb. 19, 2024) (rejecting the argument that certain events served as red flags because they did not "concern[]," "relate to," or were "'sufficiently similar' to the wrongdoing challenged by the plaintiffs" (quoting *Melbourne Mun. Firefighters' Pension Tr. Fund ex rel. Qualcomm, Inc. v. Jacobs*, 2016 WL 4076369, at *8 (Del. Ch. Aug. 1, 2016), *aff'd*, 158 A.3d 449 (Del. 2017)); *City of Detroit Police & Fire Ret. Sys. ex rel. NiSource, Inc. v. Hamrock*, 2022 WL 2387653, at *26 (Del. Ch. June 30, 2022) (concluding an alleged red flag evincing "a failure to *follow* internal documentation" did not put the directors on notice of a potential corporate trauma concerning a failure to "*maintain* proper documentation"); *Melbourne Mun. Firefighters' Pension Tr. Fund ex rel. Qualcomm, Inc. v. Jacobs*, 2016 WL 4076369, at *8 (Del. Ch. Aug. 1, 2016) ("The subsequent complained-of 'corporate trauma,' however, must be sufficiently similar to the misconduct implied by the 'red flags' such that the board's bad faith, 'conscious inaction' proximately caused that trauma." (footnote omitted) (quoting *South v. Baker*, 62 A.3d 1, 15 (Del. Ch. 2012)), *aff'd*, 158 A.3d 449 (Del. 2017); *In re Dow Chem. Co. Deriv. Litig.*, 2010 WL 66769, at *13 (Del. Ch. Jan. 11, 2010) ("Plaintiffs argue that because bribery may have occurred in the past ([the company] paid a fine to the SEC in January 2007), by different members of management, in a different country (India), and for a different transaction (pesticide registrations), the board should have suspected similar conduct by different members of management, in a different country, in an unrelated transaction.  This argument is simply too attenuated to support a *Caremark* claim." (footnote omitted)); *see also In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 129 (Del. Ch. 2009*)* (rejecting the argument that "prior, *unrelated* wrongdoing would make directors 'sensitive to similar circumstances'" (citation omitted)).

the Court can reasonably infer that the alleged red flag put the board on notice or should have put the board on notice of the wrongdoing alleged in the plaintiff's complaint.[186] The receipt of a subpoena or notice a lawsuit has been filed is not per se evidence that the company is engaged in ongoing wrongdoing.[187] Rather, whether subpoenas or regulatory investigations serve as red flags absent a finding of wrongdoing "depends on the circumstances."[188] The same is true of civil litigation, which may serve as a red flag if there are other facts suggesting the board was already on notice of wrongdoing.[189]

Plaintiff tacitly acknowledges that this Court has rejected the idea that reports of increasing regulatory scrutiny, state investigations, and threatened litigation, without more, constitute red flags.[190] Plaintiff contends such reports served as red flags here because they were presented in the context of notice that Centene's compliance assessment and monitoring functions were not functioning. Plaintiff argues those reports, coupled with reports of inadequate compliance measures, gave

---

[186] *See Clem*, 2024 WL 668523, at *10.

[187] *Id.* ("The receipt of a lone subpoena or launch of a regulatory investigation does not necessarily show that directors knew the company was breaking the law. It might not even indicate that the company was breaking the law in the first place." (footnote omitted)).

[188] *Rojas*, 2019 WL 3408812, at *11.

[189] *Cf. id.* at *13 ("The *Spann* action was a purely civil matter of the type that commercial parties routinely settle after motion practice. It was not brought against the backdrop of a prior settlement where clear, repeated violations of a law had been found.").

[190] PAB at 51–52 (citing *Fisher ex rel. LendingClub Corp. v. Sanborn*, 2021 WL 1197577 (Del. Ch. Mar. 30, 2021); *Reiter v. Fairbank*, 2016 WL 6081823 (Del. Ch. Oct. 18, 2016)).

the Board notice that Centene was headed for a corporate trauma, and that the Board willfully ignored that information and consciously decided not to act.

For purposes of demand futility, the analysis must focus on the period after Dallas and Trubeck joined the Board. After that period, the reports of Centene's compliance issues were limited to the annual health plan compliance reports to the compliance committee, which Plaintiff alleges were passed on to the Board.

Against that backdrop, Plaintiff identifies several red flags, which can be grouped into three categories: (1) the subpoena served on KMPG in connection with the Ohio attorney general's investigation; (2) updates that Centene was continuing to face regulatory and legal scrutiny or was continuing to face an increase in regulatory scrutiny and legal scrutiny; and (3) updates from Centene's general counsel concerning regulatory investigations in Ohio and elsewhere.[191] I address each category of information in turn, then consider them in the context of the compliance committee's reports.

The audit committee learned of the KPMG subpoena on April 22, 2019. Plaintiff infers the committee informed the Board of the subpoena when it gave its Board update the following day.[192] Dallas, Robinson, and Trubeck did not serve on

---

[191] Plaintiff also points out that at the audit committee's February 2020 meeting, it was informed that Centene "renewed the CVS Contract without consulting the Board." PAB 48. I understand Plaintiff is not presenting this fact as a red flag.

[192] Crawford Aff., Ex. 43 at -7317.

the Board when any of those updates were given, and Plaintiff does not allege they were later provided with this information. Even assuming the audit committee passed its information along to the full Board, that information was limited to what the committee knew, which was that the Ohio attorney general "would be issuing a grand jury subpoena requesting the [Ohio MCO subsidiary's] audit working papers for 2016, 2017, and perhaps 2018."[193] This falls far short of putting the directors on notice of the Cost Reporting Scheme's existence or demonstrating that they should have been aware.[194] Indeed, nothing in the record suggests that the directors knew of the subpoena's contents or the conduct the Ohio attorney general was investigating.[195] The subpoena, the contents of which were unknown, could not have put the demand board on notice of any impending corporate trauma.

---

[193] Szustak Aff., Ex. 14 at -2963.

[194] *Clem*, 2024 WL 668523, at *10; *Fisher ex rel. LendingClub Corp. v. Sanborn*, 2021 WL 1197577, at *12 (Del. Ch. Mar. 30, 2021) ("The issuance of a subpoena or the launch of a regulatory investigation does not 'necessarily demonstrate that a corporation's directors knew or should have known that the corporation was violating the law.'" (quoting *Rojas*, 2019 WL 3408812, at *11)).

[195] *See Fisher*, 2021 WL 1197577, at *20 (reasoning the plaintiff failed to plead the director defendants had actual knowledge of the subject matter of an FTC investigation where the complaint contained no allegations that the directors reviewed a subpoena issued in connection with the investigation and where no board-level presentations described the subpoena's contents).

Next, beginning in 2018, the Board was aware of regulatory scrutiny into its PBM operations, sparked, at least in part, by a public backlash to spread pricing.[196] Management told the Board Centene was responding by moving all health plans to a pass-through pricing model by 2020 through the transition to RxAdvance.[197] By February 2019, the Board was told regulatory inquiries were ongoing in three states, and that Centene faced the risk of adverse legal consequences as a result of those investigations, including findings that its MCO subsidiaries were not complying with their state Medicaid contracts.[198] Those three states were out of the thirty in which Centene operated managed care Medicaid plans that year.[199] Plaintiff does not allege the Board was aware of the exact subject of those inquiries; there are no allegations supporting the inference that the directors had reason to suspect wrongdoing. In April, the Board was informed that the Ohio attorney general signaled an intent to sue PBMs.[200] The Board received no additional negative information on the issue through the end of 2019, save a legal update that was limited

---

[196] Crawford Aff., Ex. 26 at -5935. Plaintiff acknowledges that these updates did not specifically reference illegal or fraudulent conduct. PAB 54 ("That reports of steadily increasing regulatory scrutiny failed to reference specific illegal or fraudulent conduct . . . .").

[197] Crawford Aff., Ex. 24 at -5282.

[198] Crawford Aff., Ex. 25 at -4594, -4598.

[199] Centene Corporation, Form 10-K (Annual Report), at 5 (Feb. 18, 2020).

[200] Crawford Aff., Ex. 22 at -4901.

to the events in Ohio.[201]  And again, Dallas, Robinson, and Trubeck did not serve on the Board when any of those updates were given, and Plaintiff does not allege they were later provided with an update on any of the forgoing.

In February 2020, the Board was informed the scrutiny continued, though the Board was not told it had expanded to any additional states.[202]  Then in April, the enterprise risk management update categorized PBM risk as a legal risk for the first time.[203]  It is reasonable to infer this reframing was significant and represented a perceived greater risk of adverse legal action.  But the update still did not put the Board on notice of the Cost Reporting Scheme.  Even if it put the Board on notice of a risk of corporate trauma, the Board was simultaneously informed that "[s]enior management [was] actively working to mitigate legal exposures and to take corrective action to lessen future legal risk."[204]

In July, the Board received an update from Centene's general counsel, but that update was limited to Ohio.[205]  Later in the year a presentation specified four states in which regulatory inquiries remained ongoing, and a legal services update noted

---

[201] Crawford Aff., Ex. 27 at -5220.

[202] Crawford Aff., Ex. 42 at -3375.

[203] Crawford Aff., Ex. 49 at -3613.

[204] *Id.*

[205] Crawford Reply Aff., Ex. 4 at -7314.

that a plaintiff's law firm was investigating in four states.[206]  But the Board was again assured management was working to address the issue.[207]  The Board again received similar information in February 2021, with the same assurance that steps were being taken.[208]

And so, through April 2020, PBM risk was presented as a regulatory and reputational risk with the possibility for adverse legal action.  Those updates were devoid of details and at best put the Board on notice of regulatory scrutiny into Centene's PBM operations in a handful of states.  When the matter was framed as a regulatory risk, the directors were informed that management was addressing it through lobbying and public relations.[209]  When the risk was framed as a legal one beginning in April 2020, the directors were told that management was actively working to mitigate that risk and decrease Centene's exposure.[210]  The Board was not put on notice that Centene was heading for corporate trauma—and certainly not from the Cost Reporting Scheme or any other particular wrongdoing.

Finally, as to the general counsel's updates, there is no indication that they put the Board on notice of anything other than the Ohio attorney general's investigation

---

[206] Crawford Aff., Ex. 58 at -5625, -5798.

[207] *Id.* at -5625.

[208] Crawford Aff., Ex. 41 at -6603.

[209] *E.g.*, Crawford Aff., Ex. 26 at -5997.

[210] *E.g.*, Crawford Aff., Ex. 58 at -5625.

and potential litigation in up to three other states. And Plaintiff failed to plead particularized facts demonstrating the general counsel described the Cost Reporting Scheme or any other wrongdoing of which Centene was being accused, as there is nothing in the record suggesting Centene was aware of that information before the Ohio attorney general filed its complaint. Regardless, the states identified in the general counsel's reports represent only a fraction of the states in which Centene operated managed care plans. This is hardly the sort of widespread legal action that puts directors on notice of impending corporate trauma.[211]

Consistent with this granular review of the information given to the Board, Plaintiff makes no argument that the demand board was on notice or should have been on notice of the Cost Reporting Scheme specifically. Plaintiff's argument is more abstract: the aforementioned information, set in the context of the knowledge that Centene's compliance systems needed improvement, should have put the Board on notice that Centene was headed for a corporate trauma, and that from there, the Board willfully ignored that evidence and decided to do nothing.

---

[211] *See, e.g.*, *Lebanon Cnty. Emps.' Ret. Fund v. Collis*, 2022 WL 17841215, at \*16 (Del. Ch. Dec. 22, 2022) ("In this case, the complaint identifies over seventy examples of subpoenas, settlements, civil litigation, congressional reports, and analyses of regulatory risks that put the directors on notice of problems at the Company. The directors did not just see red flags; they were wrapped in them."), *rev'd on other grounds*, 311 A.3d 773 (Del. 2023).

I will assume that that adding knowledge of a known faulty compliance system to knowledge of investigations, a subpoena, and regulatory scrutiny would put the Board on notice that Centene was heading for major corporate trauma. But Plaintiff has not supported the essential conclusion that the Board ignored that information in bad faith. "To establish the requisite inference of bad faith, a plaintiff would have to plead (and later prove) that the directors knew from the red flags that the corporate trauma was coming and nevertheless forged ahead for reasons unrelated to the best interests of the corporation."[212] Plaintiff has not shown the Board failed to respond in bad faith. Rather, the Board accepted management's statements that both the compliance issues and the regulatory risks were being handled. The Board did not make a conscious decision to violate the law. Plaintiff has not rebutted the presumption that the Board acted in good faith.

\* \* \*

Plaintiff failed to plead that a majority of the demand board faces a substantial likelihood of liability for its *Caremark* claims. Count I is dismissed. The demand board is therefore capable of considering whether to bring Counts II and III against the Officer Defendants. Those counts are likewise dismissed.

---

[212] *Walton*, 2023 WL 3093500, at \*33.

51

## III.  CONCLUSION

Defendants' motion to dismiss is **GRANTED** as to Counts I, II, and III.